UNITED STATES of America, ex rel. Eldon BARTH; United States of America, ex rel. International Brotherhood of Electrical Workers, Local 292, Appellants,

v.

RIDGEDALE ELECTRIC, INC.; Gerald Wagoner, Appellees.

No. 93–3176.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1994.

Decided Jan. 13, 1995.

Richard Kaspari, Minneapolis, MN, argued, for appellants.

John G. Patterson, Minneapolis, MN, argued (Leonard W. Glewwe, on brief), for appellees.

Before RICHARD S. ARNOLD, Chief Judge, ROSS, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

ROSS, Senior Circuit Judge.

This is a *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729–3733 (the Act), brought on behalf of the United States by Eldon Barth and International Brotherhood of Electrical Workers, Local 292 (the Union) (collectively referred to as "relators"), against Ridgedale Electric and its president and sole shareholder, Gerald Wagoner (collectively referred to as "defendants"). The relators' complaint alleges that the defendants violated the False Claims Act, 31 U.S.C. § 3729, by submitting false certifications of contract compliance and fraudulent payroll reports to the government in order to conceal the fact that the defendants had failed to pay their employees the prevailing wages required by the Davis–Bacon Act for their work on a federally-funded electrical construction project at the Braemar Golf Course in Edina, Minnesota (the "Braemar project").

The district court dismissed this action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for failure to satisfy the subject matter jurisdiction requirements of 31 U.S.C. § 3730(e)(4). Specifically, the district court held that the Union's knowledge of the false nature of the defendants' payroll reports and contract compliance certifications to the government on the Braemar project was insufficiently "direct" to give the Union "original source" relator standing under 31 U.S.C. § 3730(e)(4)(B), and that Barth had not "voluntarily" provided his information regarding the defendants' alleged fraudulent submissions to the government within the meaning of that same section. We affirm.

## I.

From December 1985 through September 1986, Ridgedale performed electrical work on a construction project at Braemar Golf Course in Edina, Minnesota. The project was partially funded through a federal Community Development Block Grant administered through the Department of Housing and Urban Development (HUD), and thus was subject to the federal prevailing wage requirements of the Davis–Bacon Act.

Between January 29, 1986, and October 16, 1986, Ridgedale submitted five applications for partial payment on the Braemar project. With its final application, Ridgedale requested payment of all remaining contract proceeds, including the retainage. On November 28, 1986, Ridgedale was notified that the retainage would not be paid until it submitted weekly payroll reports required under the Davis–Bacon Act. Initially, Ridgedale contested the applicability of the Davis–Bacon Act to the project and refused to provide the payroll reports. Negotiations on the issue continued for approximately one year, after which Ridgedale eventually agreed to submit the reports for each of the thirty-three weeks it worked on the project. These payroll reports classified two Ridgedale employees as electricians, four employees as laborers, and one employee, Eldon Barth, as superintendent. Barth was actually employed on the Braemar project as a full-time journeyman electrician, without supervisory duties or powers. Based on these reports, the amount of wages paid to Ridgedale's employees was subtracted from the applicable Davis–Bacon prevailing wage rate to calculate the additional amount of wages due to the employees for their work on the project. The additional wages due were then taken from the contract retainage and paid by the City directly to the employees. Because the defendants had reported Barth as an exempt superintendent, he received no additional compensation.

At about the same time that local officials were settling Ridgedale's admitted prevailing wage liability out of the retainage on the Braemar project, Gerald Wagoner, Ridgedale's president and sole shareholder, requested Barth to prepare two sets of false time cards for the project which would indicate that he had been supervisor on the project. Barth complied with the request and was subsequently laid off.

While the project was in progress, Michael Priem, business representative of the Union, visited the job site on a number of occasions and observed the nature of the work performed by Ridgedale employees. In November of 1988, Priem met with Ridgedale employees in an attempt to organize them.

During these meetings, Priem and the employees discussed the wages they had received on the Braemar project. Subsequently, in January of 1989, Priem obtained copies of the payroll reports Ridgedale Electric had submitted on the project. From these reports and his discussions with Ridgedale employees, Priem formed a suspicion that Ridgedale had falsely characterized its employees on the payroll reports. He again spoke with Ridgedale employees to confirm his suspicions. He then relayed the information he gathered to Richard Nark, a HUD investigator. Shortly thereafter, Nark met with Barth, who confirmed that he had been employed as an electrician rather than a superintendent.

Priem also supplied this information to the Hennepin County Board of Commissioners and the Hennepin County Attorney. On August 29, 1989, at the Union's urging, the Board of Commissioners passed a resolution urging HUD to investigate allegations against Ridgedale involving federal labor standards violations on the Braemar project. The Hennepin County Attorney's Office recommended the case for "no prosecution" because the applicable statute of limitations period had expired. To date, no action has been brought challenging Ridgedale's compliance with federal prevailing wage requirements on the Braemar project.

On January 9, 1992, the Minneapolis Star Tribune published an article reporting allegations that Ridgedale failed to pay prevailing wages on the Braemar project.

In July of 1992, Barth and the Union brought this action on behalf of the United States against Ridgedale Electric and Wagoner. In their complaint, Barth and the Union allege that the defendants falsely certified compliance with Davis–Bacon Act requirements on the periodic payment applications, and that the defendants misclassified the employees on the weekly payroll reports to avoid paying prevailing wages.

## II.

■ The False Claims Act, 31 U.S.C. §§ 3729–3733, as amended in 1986, allows the United States or private citizens acting on behalf of the United States, to recover treble damages from those who knowingly make false claims for money or property upon the United States, or who submit false information in support of such claims. *See United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir.1990) (*Dick*). The history of the Act demonstrates repeated congressional efforts to resolve a tension between encouraging private citizen involvement in exposing fraud against the government while preventing opportunistic suits by private persons who became aware of fraud but played no part in exposing it.[1] Therefore, the Act must be analyzed in the context of its twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.

In order to avoid lawsuits by opportunistic plaintiffs, a *qui tam* plaintiff, or relator, may not bring an action based upon publicly disclosed allegations or transactions unless the plaintiff was an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A).[2] An "original source" is defined in the Act as an individual who (1) has direct and independent knowledge of the information on which the

---

1. The False Claims Act was first passed in 1863 and specifically provided for *qui tam* actions to encourage private citizens or "relators" to come forward and expose fraud against the government. In 1943, amendments severely restricted the number of potential *qui tam* actions. Recognizing the need to increase government and private efforts to stop fraud, Congress liberalized some of the Act's provisions in 1986. For a thorough discussion of the history of the Act, see *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649–52 (D.C.Cir.1994) and *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1152–54 (3d Cir.1991).

2. 31 U.S.C. § 3730(e)(4)(A) provides in relevant part:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless ... the person bringing the action is an original source of the information.

allegations are based, and (2) has voluntarily provided the information to the government prior to filing suit. 31 U.S.C. § 3730(e)(4)(B);[3] *Dick,* 912 F.2d at 16.

■ A court reaches the original source question only if it finds the plaintiff's suit is based on information that has already been publicly disclosed. *United States ex rel. Cooper v. Blue Cross & Blue Shield, Inc.,* 19 F.3d 562, 565 (11th Cir.1994); *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992). Because public disclosure has been conceded on appeal in the present case, our analysis turns on whether Barth or the Union is an "original source" under the Act.

■ As previously stated, a *qui tam* relator must have both independent and direct knowledge of the alleged fraudulent activity in order to satisfy the subject matter jurisdiction requirement of section 3730(e)(4). "Independent knowledge" has been consistently defined as knowledge that is not dependent on public disclosure. *See, e.g., United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3d Cir.1991) (*Prudential*). Here, the district court found that both Barth and the Union knew of Ridgedale's alleged fraudulent activity prior to the public disclosures and concluded that their knowledge was "independent" of such disclosures. Therefore, the crux of our analysis with respect to the Union turns on whether Michael Priem, business representative for the Union, had "direct" knowledge of the alleged fraudulent activity.

### III.

■ "Direct" knowledge under the Act has been defined as knowledge "marked by absence of an intervening agency," *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 656 (D.C.Cir.1994) (citing *Prudential,* 944 F.2d at 1160), or "unmediated by anything but [the plaintiff's] own labor." *Wang,* 975 F.2d at 1417. A relator is said to have direct knowledge of fraud

when he "saw [it] with his own eyes." *Id.* The direct knowledge requirement was intended to avoid parasitic lawsuits by "disinterested outsider[s]" who "simply stumble across an interesting court file." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1258 (S.D.Fla.1989) (*Provident*). Instead, the Act seeks to encourage persons with "*first-hand* knowledge of fraudulent misconduct," *Prudential,* 944 F.2d at 1154 (emphasis added), or those "who are either *close observers* or *otherwise involved* in the fraudulent activity" to come forward. S.Rep. No. 345, 99th Cong., 2d Sess. 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5269 (emphasis added). On the other hand, a person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the Act. *See Prudential,* 944 F.2d at 1160–61. Accordingly, "collateral research and investigations ... [do] not establish 'direct and independent knowledge of the information on which the allegations are based within the meaning of § 3730(e)(4)(B).'" *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1159 (2d Circuit 1993). *But see United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 39 F.3d 957, 961 (9th Cir.1994); *Provident,* 721 F.Supp. at 1257–58.

■ Here, the district court correctly concluded that the Union did not have original source standing because Michael Priem did not have direct knowledge of Ridgedale's alleged fraud against the government. Priem did not have direct knowledge of the manner in which Ridgedale classified its employees; instead he obtained this information through intermediary sources. Priem's information was derived from 1) his visits to the Braemar project job site and his observations of individuals doing electricians' work; 2) copies of publicly-filed payroll records indicating these employees were not being paid electricians'

---

**3.** 31 U.S.C. § 3730(e)(4)(B) provides:
   For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information

on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

wages; and 3) his interviews with Ridgedale employees. As the district court stated, Priem "was, in effect, simply gathering information on behalf of the Union ... [and] [a]s such, he was a recipient of information and not a direct source." Because Priem did not have direct knowledge of the alleged fraud, he was not an original source under the Act and the Union's claim was properly dismissed pursuant to the jurisdictional bar of section 3730(e)(4).

### IV.

 The district court determined that Barth, on the other hand, had direct knowledge of the alleged fraud by virtue of his employment with Ridgedale. The court concluded, nonetheless, that Barth did not qualify as an original source because he did not "voluntarily provide" the information regarding Ridgedale's alleged fraud to the government prior to filing suit as required by 31 U.S.C. § 3730(e)(4)(B). Barth's only contact with a government official prior to filing this action was his discussion with Richard Nark, the HUD investigator, which occurred almost two years after Ridgedale's alleged fraudulent activities. More importantly, however, this discussion was initiated by Nark rather than Barth. Barth urges on appeal that once contacted, he "voluntarily" provided the information requested by the HUD investigator, and thus he was an original source within the meaning of the Act. Such a conclusion, however, ignores the clear intent of the Act which is to encourage private individuals who are aware of fraud against the government to bring such information forward at the earliest possible time and to discourage persons with relevant information from remaining silent. *Wang,* 975 F.2d at 1419 (citing H.R.Rep. No. 660, 99th Cong., 2d Sess. 22 (1986)).

Although Barth had been aware of Ridgedale's possible fraud against the government for some time he remained silent until the government itself heard of the fraud and

began its own investigation. In this sense, Barth did not "voluntarily" bring the information to the government and now rewarding him for merely complying with the government's investigation is outside the intent of the Act. Accordingly, we conclude Barth did not have original source status and his suit was properly dismissed.[4]

### V.

The judgment of the district court is affirmed.

---

4. We do not reach the question whether the relator must also satisfy a third requirement before obtaining original source status as determined by the Second and Ninth Circuits. Those circuits have held that the relator must also prove he was a source of the information *to the*

*entity that publicly disclosed the allegations* upon which the suit is based. *See United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13, 16–17 (2d Cir.1990); *Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992).