

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-28-2005

# USA v. Sorgnard

Precedential or Non-Precedential: Precedential

Docket No. 03-4163

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Sorgnard" (2005). *2005 Decisions.* Paper 1526.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1526

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-4163
_____

UNITED STATES OF AMERICA, ex. rel.
Stephen Paranich, D.C.; STEPHEN PARANICH,
Appellants

v.

DEBORAH SORGNARD; MATRIX BIOKINETICS, INC.;
RICHARD SORGNARD, Ph.D.; CLINICAL
ELECTROMEDICAL RESEARCH ACADEMY, CHTD.;
CERA INTERNATIONAL INC., and others to be
determined, jointly and severally; IRWIN LEASING
CORPORATION f/k/a ALLIED CAPITAL CORPORATION

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 98-cv-02070)
District Judge:  Honorable Christopher C. Conner

_____

Argued September 27, 2004
Before:  RENDELL, FUENTES and SMITH, Circuit Judges.

(Filed January 28, 2005)

———————

Ian Stuart  (ARGUED)
1700 Market Street, Suite 2632
Philadelphia, PA 19103
*Counsel for Appellants*

Cheryl H. Picker
443 Northfield Avenue
West Orange, NJ 07052

William R. Keller
Latona and Keller
8 West Market Street
930 Citizens Bank Center
Wilkes-Barre, PA 18701
*Counsel for Appellant Stephen R. Paranich*

Andrew J. Giorgione
200 Locust Street, Suite 400
Harrisburg, PA 17101

Marianne C. Koepf
Stephen Kaus      (ARGUED)
Cooper, White & Cooper, LLP
201 California Street
San Francisco, CA 94111
*Counsel for Appellee*

———————

# OPINION OF THE COURT

RENDELL, Circuit Judge.

Doctor Stephen Paranich brought this qui tam action against Irwin Leasing Corporation, formerly Affiliated Capital Corporation, a company that finances the purchase of equipment, under the False Claims Act ("FCA" or "Act"), 31 U.S.C. § 3729 et seq. Paranich alleges that Irwin fraudulently induced him to file false Medicare reimbursement claims for chiropractic treatments in which he used a medical device called the Matrix. Irwin has consistently denied liability for any false Medicare claims and further contends that Paranich is not a proper relator in a qui tam action because the allegations he now asserts had been publicly disclosed before his suit and because he is not an original source as defined by the FCA.[1] On Irwin's motion for summary judgment, the District Court agreed with Irwin on both points and dismissed the complaint for lack of subject matter jurisdiction. Although our reasoning differs somewhat from that of the District Court, we will affirm its dismissal because we conclude that Paranich is not a proper relator under the FCA because his allegations were based on

public disclosures and he does not qualify as an "original source."

---

[1] A qui tam plaintiff is commonly referred to as a "relator." See Hutchins v. Wilentz, Goldman, & Spitzer, 253 F.3d 176, 182 (3d Cir. 2001).

3

## I. Factual Background

Matrix Biokinetics, Inc. is a Nevada corporation that sold medical devices throughout the United States. On or about January 1, 1994, Matrix began marketing and selling electrical nerve stimulation devices known as the Matrix Pro Elec DT and the Matrix Pro Elec DT2 (referred to collectively and severally as the "Matrix device"). CERA International, Inc. is a research and technical organization that conducted sales conferences for the Matrix device. After attending a sales conference in late 1996, Paranich decided to acquire a Matrix device for the treatment of patients at his medical clinic, Comprehensive Medical Network ("CMN"). CMN subsequently arranged with an independent sales representative to finance the purchase of the device through leases with Irwin. On December 19, 1996, and March 12, April 4, and June 10, 1997, CMN and Irwin entered into four separate written agreements to lease four Matrix devices.

The Matrix device works by pulsating electricity to the nerves of a patient at various frequencies through electrodes attached to the patient's body. According to materials published by CERA, when the Matrix device is used at high frequencies, it operates as a neuron blockade, or "nerve block." This electric nerve block functionality has been viewed as an alternative to a traditional chemical injection nerve block.

By June 1994, the U.S. Food and Drug Administration had approved both models of the Matrix device for marketing and sale in the United States. Ultimately, the FDA granted clearance for sale of the devices under Section 510(k) of the

Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360(k), however, the devices were never approved for sale as nerve block devices.

In January 1997, Paranich began submitting claims to Medicare for reimbursement for procedures involving the Matrix device. Under the Medicare system, claims for reimbursement are submitted under standard uniform codes set by the American Medical Association's Current Procedural Terminology ("CPT") manual. Paranich was submitting claims for treatments involving the Matrix device under the CPT code for "nerve block injections," which Medicare reimbursed at rates of $150 to $350 per procedure.[2] Although reimbursement for procedures submitted under the codes for "electronic stimulation" was at rates of $35 to $80 per procedure, Paranich alleged that he was advised by Matrix and CERA to submit claims for nerve block injections to maximize the reimbursement. Medicare purportedly reimbursed Paranich at the rates for nerve block injections.

In June 1997, Dr. Deborah McMenamin, a former employee of CMN, contacted Special Agent Charles Hydock of the U.S. Federal Bureau of Investigation to report that Paranich was overbilling Medicare for Matrix device procedures.

---

[2] The relevant CPT codes, 64400-64450, are labeled "Introduction/Injection of Anesthetic Agent (Nerve Block), Diagnostic or Therapeutic." Paranich also occasionally billed for Matrix device treatments under a code for "unlisted procedures."

Hydock then began an investigation of Paranich and CMN. On October 22, 1997, Paranich was served with a grand jury subpoena requiring CMN to produce, inter alia, all documents relating to the Matrix devices, specifically including billing documents. Paranich stopped billing under the nerve block codes in February 1998.

After being served with the subpoena, Paranich's lawyer, Kenneth Haber, began investigating the Matrix device. During an extensive investigation, which Haber conducted with limited participation from Paranich, Haber discovered that Transamerica Occidental Life Insurance Company, the carrier and administrator for the Medicare program in Southern California, had published a bulletin advising its providers not to bill Matrix device procedures under the CPT codes for nerve block injections.[3] He also learned that in mid-1998, Transamerica held hearings to determine the proper billing code and attendant reimbursement rates for electrical nerve blocks. Haber learned about the bulletin and hearings by October 1998, and, shortly thereafter, he requested a report of the Transamerica hearings from the government under the Freedom of Information Act ("FOIA").

Throughout the investigation, Haber was notably cooperative with the government. He communicated with the

[3] Citing Irwin's statement of facts (discussed at infra note 5), the District Court found that Transamerica published the bulletin in October 1997. According to the record, the bulletin was actually dated March 1998.

FBI and U.S. Attorneys' offices, writing letters to each to provide updates on the progress of the response to the subpoena. In a letter to the U.S. Attorneys' office dated April 3, 1998, he outlined the alleged fraud perpetrated by Matrix and affiliated companies as his investigation began to disclose this information. The response to the subpoena included seventy (70) boxes of billing records and other materials that were turned over to the FBI.

On May 20, 1998, during the time Haber was conducting his investigation and preparing a response to the subpoena, a group of doctors in Southern California filed a suit against Matrix alleging fraud with respect to billing codes that Matrix had allegedly recommended to those doctors. This state court fraud action, Heifets v. Matrix Electromedical, No. BC-191317 (Ca. Super. 1998), named Irwin as a defendant; however, summary judgment was eventually entered in Irwin's favor after the Court concluded that Irwin was not responsible for Matrix's activities. Irwin was also named as a defendant in a similar suit, Rubanenko v. Matrix Biokinetics, Inc., No. BC-196145 (Ca. Super. 1998). Rubanenko was voluntarily dismissed in August 1998.

## II. Procedural History

On December 21, 1998, Paranich filed the original complaint in this action. See United States ex rel. Paranich v. Sorgnard, 286 F. Supp. 2d 445 (M.D. Pa. 2003). In October 2000, Paranich amended the complaint to include Irwin as a defendant, asserting that Irwin had induced him to file false Medicare reimbursement claims for treatments involving the

7

Matrix device. Irwin moved for summary judgment with respect to the FCA claim, denying liability and arguing that Paranich was not a proper relator under the Act.[4]

The District Court analyzed whether it had subject matter jurisdiction under the jurisdictional constraints of the FCA. <u>See United States ex rel. Fine v. MK-Ferguson Co.</u>, 99 F.3d 1538, 1543 (10th Cir. 1996) ("When a court's subject matter jurisdiction depends upon the same statute that creates the substantive claims, the jurisdictional inquiry is necessarily intertwined with the merits."). Adopting Irwin's statement of facts for the most part,[5] the District Court ultimately determined

---

[4] Default judgments were entered against Defendants Matrix Biokinetics, Richard Sorgnard, and CERA International for failure to answer or otherwise plead. Irwin Equipment Finance Corporation and Irwin Finance Corporation successfully moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

[5] Under the local rules for the U.S. District Court for the Middle District of Pennsylvania, a party moving for summary judgment must attach to the motion "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1. The non-moving party is required to submit a statement of facts to respond to the numbered paragraphs set forth in the moving party's statement, noting those facts "as to which it is contended that there exists a genuine issue to be tried." <u>Id.</u> Both statements must reference the record for support, and the moving party's statement of facts

that the action did not meet the jurisdictional requirements of the FCA because although his complaint was based on prior public disclosures, Paranich did not qualify as an original source because it was his attorney's investigation that disclosed the alleged fraud, and the information uncovered during the investigation was not "independent" of the public disclosures. With the dismissal of the FCA claim, the Court dismissed Irwin's remaining state law counterclaim for indemnity as lacking independent subject matter jurisdiction. See 28 U.S.C. § 1367(c)(3) ("[A] district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

## III. Jurisdiction and Standard of Review

Paranich now appeals the District Court's decision, complaining that the Court erred in its finding that he was not an "original source" of the information regarding the alleged fraud under the FCA. We have jurisdiction to review this final decision of the District Court under 28 U.S.C. § 1291. We

---

will be deemed to be admitted unless controverted by the non-moving party. See id.

The District Court noted that Paranich's statement of facts did not respond to Irwin's statement and was "replete with unsupported factual assertions." Paranich, 286 F. Supp. 2d at 447 n.3. Consequently, the Court adopted all of Irwin's facts that were not clearly disputed by Paranich with adequate references to the record. See id.

exercise plenary review of a dismissal for lack of subject matter jurisdiction. See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1152 (3d Cir. 1991) (citing York Bank & Trust Co. v. Fed. Sav. & Loan Ins. Corp., 851 F.2d 637, 638 (3d Cir. 1988)).

## IV. Discussion

## A. **Introduction**

We have, on several prior occasions, engaged in extensive reviews of the history and background of the False Claims Act. See, e.g., United States ex rel. Dunleavy v. County of Del., 123 F.3d 734, 738 (3d Cir. 1997); Stinson, 944 F.2d at 1152-54; id. at 1162-68 (Scirica, J., dissenting). And we have expended a fair amount of ink examining various aspects of the Act's jurisdictional bar provision.[6] To resolve the instant

---

[6] See, e.g., United States ex rel. Mistick PBT v. Hous. Auth., 186 F.3d 376, 382-89 (3d Cir. 1999) (holding that regarding the FCA jurisdictional bar provision, a response to an FOIA request was a public disclosure and an action is based upon a public disclosure if it sets out either the allegations advanced in the action or all the essential elements of the action's claims); id. at 389-403 (Becker, C.J., dissenting) (arguing for a narrower interpretation of what constitutes a public disclosure and stating that the majority opinion on the "critical issue" of the construction of "based upon" was "manifestly incorrect"); Stinson, 944 F.2d at 1154-61 (holding that under the FCA jurisdictional bar provision the disclosure of discovery material

10

appeal, we need not reopen Pandora's box with respect to certain requirements of the Act, such as the contours of the "public disclosure" requirement.  Nor do we choose to resolve the issue that the District Court addressed, namely, whether Paranich's knowledge was "direct" given the role his attorney played in the investigation.  This is because we see the instant matter as turning on an issue we have not previously addressed, namely, the requirement that the source must have provided information to the government "voluntarily."

In broad strokes, the FCA imposes penalties on persons who knowingly submit fraudulent claims to the government.  To encourage the ferreting out of fraud against the government, the FCA incentivizes private individuals aware of such fraud to bring civil actions as relators against those submitting such claims by allowing relators to collect a percentage of any recovery.  Prior to filing such a civil action, known as a <u>qui tam</u> action, the relator must disclose the information regarding the fraud to the government. The government then has sixty days to intervene and take over the action.  <u>See</u> 31 U.S.C. § 3730(b).  If the government does not do so, the relator may continue with the

_____

to a party not under a court imposed limitation as to its use was a public disclosure); <u>id.</u> at 1162-76 (Scirica, J., dissenting) (arguing for a narrower interpretation of public disclosure focusing on public accessibility); <u>see also Mistick</u>, 186 F.3d at 390, 391 (Becker, C.J., dissenting) (stating that <u>Stinson</u> was "wrongly decided" and a "candidate, at some point in time, for en banc consideration" for broad holding regarding what constitutes a public disclosure).

action unless the FCA's jurisdictional bar provision is triggered. The jurisdictional bar provision operates to exclude qui tam actions based upon allegations of fraud or fraudulent transactions that have been publicly disclosed prior to their filing. The provision was "designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." Stinson, 944 F.2d at 1155-56. This provision does, however, contain a "savings clause," preserving suits brought by an "original source" of the information even where there have been prior public disclosures.

The text of the jurisdictional bar provision reads:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this

12

section which is based on the information.

31 U.S.C. § 3730(e)(4).  As enumerated elements, this section divests courts of subject matter jurisdiction where:

> (1) there was a "public disclosure";
>
> (2) "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media";
>
> (3) of "allegations or transactions" of the fraud;
>
> (4) that the relator's action was "based upon"; and
>
> (5) the relator was not an "original source" of the information.

Cf. Dunleavy, 123 F.3d at 738.  We will employ this catalog of elements to structure our analysis, touching on certain aspects more briefly than others.

## B.  Public Disclosure

Corresponding to the first two elements in our catalog, to qualify as a public disclosure under the FCA, a disclosure must (1) issue from a source or occur in a context specifically recognized by the Act, and (2) be sufficient to support the

conclusion that the information contained therein is now public within the meaning of the Act.  See Mistick, 186 F.3d at 383; Dunleavy, 123 F.3d at 744.  Regarding the first requirement, Section 3730(e)(4)(A) clearly provides three classes of sources or contexts of disclosures: (1) criminal, civil, or administrative hearings; (2) congressional, administrative, or Government [General] Accounting Office reports, hearings, audits, or investigations; and (3) the news media.  In Dunleavy, we subscribed to the prevailing view that this list is "an exhaustive rendition of the possible sources."  Id.[7]  As to the second requirement, i.e., the sufficiency of the disclosure as public

---

[7] Accord United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 323 (2d Cir. 1992); United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1499-1500 (11th Cir. 1991) (noting that Congress did not qualify list with "such as," "for example," or like terms); United States ex rel. LeBlanc v. Raytheon Co., 913 F.2d 17, 20 (1st Cir. 1990); 132 Cong. Rec. H9382-03 (1986) ("Before the relevant information regarding fraud is publicly disclosed through various government hearings, reports and investigations which are specifically identified in the legislation or through the news media, any person may file such an action as long as it is filed before the government filed an action based upon the same information.") (submitted by Rep. Berman) (emphasis added); see also United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1004 (10th Cir. 1996) (noting that "[Section 3730(e)(4)(A)] defines the sources of allegations and transactions which trigger the bar but it does not define the only means by which public disclosure can occur") (emphasis in original).

within the meaning of the Act, we have suggested that Section 3730(e)(4)(A) requires information to be public enough that it "would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." Stinson, 944 F.2d 1155-56. Whether a disclosure is "public" is a determination influenced significantly by the specific source or context of the disclosure and the particular facts of each case. Given our precedent on this issue, we have little difficulty finding that there were public disclosures in the instant matter.

We agree with the District Court's conclusion that "Irwin has established public disclosure of the alleged fraud." Paranich, 286 F. Supp. 2d at 451. Under our precedent, the Heifets and Rubanenko complaints and the FOIA report undoubtedly qualified as public disclosures. In Stinson, we held that Section 3730(e)(4)(A)'s class of "criminal, civil, or administrative hearings" should be broadly interpreted to include criminal, civil, or administrative litigation, "encompass[ing] the full range of proceedings in a civil lawsuit." See Stinson, 944 F.2d at 1156, 1157. More specifically, we held that the disclosure of discovery material to a party who is not under any court imposed limitation as to its use constituted a public disclosure within the context of a criminal, civil, or administrative hearing. See id. at 1158. Although this view is not universally held, see id. at 1168-69 (Scirica, J., dissenting) (arguing that public disclosure refers to availability of information to the general public at the time of disclosure); see also Mistick, 186 F.3d at 390 (Becker, C.J., dissenting) (decrying Stinson's definition of public disclosure for including discovery material given to a single person in

15

litigation between two private parties and not otherwise filed with a court), the issue of whether a <u>complaint</u> in a civil action qualifies as a public disclosure is potentially much less controversial. Unlike discovery material, a complaint, if it is to be operative, is necessarily filed with the court and, except in rare instances, available and accessible to the public. These two characteristics, filing with the court and public availability/accessibility, would persuade even those in disagreement with <u>Stinson</u> that a complaint is a public disclosure under the FCA. <u>See id.</u> at 391 (Becker, C.J., dissenting) (championing actual, not potential, public accessibility of court files for public disclosure determination); <u>Stinson</u>, 944 F.2d at 1170-71 (Scirica, J., dissenting) (conceding that information gleaned from browsing through public court files would constitute a public disclosure). Indeed, other courts have arrived at this conclusion, and even those critical of disclosures in <u>unfiled</u> discovery materials seem willing to concede that disclosures in <u>filed</u> materials would constitute public disclosures.[8] In any event, we are persuaded that a complaint in

---

[8]  <u>See United States ex rel. McKenzie v. Bellsouth Telcoms.</u>, 123 F.3d 935, 939 (6th Cir. 1997) ("'Public disclosure' also includes documents that have been filed with a court, such as discovery documents and a plaintiff's complaint."); <u>Fed. Recovery Servs. v. United States</u>, 72 F.3d 447, 450 (5th Cir. 1995) ("'Any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for purposes of section 3730(e)(4)(A).' . . . This includes civil complaints.") (quoting <u>United States ex rel. Siller v. Becton Dickinson & Co.</u>,

a civil action falls into the context of "criminal, civil, or administrative hearings" and is sufficiently public within the meaning of the Act to constitute a public disclosure.

As to the FOIA report obtained by Paranich's counsel, pursuant to <u>Mistick</u>, "the disclosure of information in response to a FOIA request is a 'public disclosure.'"  186 F.3d at 383. This precedent could not be more clearly applicable; the FOIA report Haber received was a public disclosure under the FCA.

## C. **Allegations or Transactions**

Upon a determination that there has been a public disclosure within the meaning of Section 3730(e)(4)(A), the next

---

21 F.3d 1339, 1350 (4th Cir. 1994) (holding further that "[a] civil complaint is unquestionably a 'public disclosure of allegations'")); <u>United States ex rel. Springfield Terminal Ry. v. Quinn</u>, 14 F.3d 645, 652 (D.C. Cir. 1994) ("[D]iscovery material, when filed with the court (and not subject to protective order), is "publicly disclosed" in a "civil hearing" for purposes of § 3730(e)(4)(A)'s jurisdictional bar."); <u>United States ex rel. Kreindler & Kreindler v. United Technologies Corp.</u>, 985 F.2d 1148, 1158 (2d Cir. 1993) (holding that in absence of a court ordered seal, the information in discovery material filed with the court "was publicly disclosed because it was available to anyone who wished to consult the court file"); <u>United States ex rel. Precision Co. v. Koch Indus.</u>, 971 F.2d 548, 554 (10th Cir. 1992) ("Allegations disclosed via civil litigation . . . fall within the scope of public disclosure as contemplated by 3730.").

17

inquiry, corresponding with the third element of our catalog, is whether the public disclosure contains "allegations or transactions" of the fraud upon which the qui tam action is based. The Heifets and Rubanenko complaints contained both allegations of fraud regarding Matrix's billing policy and at least enough information underlying those allegations to articulate a legal claim, even if the claim had no merit as against Irwin. Accordingly, we have little difficulty concluding that the complaints contained "allegations or transactions" of fraud.

## D. **Based upon**

The next step in our analysis, corresponding with the fourth element in our catalog, is a determination of whether the current action is "based upon" the public disclosure of the allegations or transactions of fraud. We have held, consistent with the majority of our sister courts of appeals, that the term "based upon" means "supported by" or "substantially similar to," not "actually derived from." Mistick, 186 F.3d at 385-88; accord United States ex rel. Biddle v. Bd. of Trs. of the Leland Stanford, Jr. Univ., 161 F.3d 533, 537-40 (9th Cir. 1998); United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 682-84 (D.C. Cir. 1997); Cooper v. Blue Cross & Blue Shield, 19 F.3d 562, 567 (11th Cir. 1994); Koch Indus., 971 F.2d at 552; United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992). But see United States v. Bank of Farmington, 166 F.3d 853, 863 (7th Cir. 1999) (holding that "based upon" means actually derived from); Siller, 21 F.3d at 1348 (same). Furthermore, we have held that "a qui tam action is 'based upon' a qualifying disclosure if the disclosure sets out either the allegations advanced in the qui tam action or all of the

18

essential elements of the qui tam action's claims." Mistick, 186 F.3d at 388.

Regarding the complaints in the California cases, we have noted above that the allegations contained in those complaints concerned Matrix's allegedly fraudulent billing policy. Specifically, the Heifets complaint alleged that the defendants:

> [I]nduced Plaintiffs and other class members to acquire the MATRIX Bioelectric Treatment System and Device known as PRO ElecDT or some other name, by misrepresenting to the class members that MEDICARE will pay for treatments given patients with this device. . . . In truth MEDICARE now claims that the billings for treatments rendered by the device were erroneous and in violation of MEDICARE Law.

Complaint ¶ 6, Heifets v. Matrix Electromedical, No. BC-191317 (Ca. Super. 1998) The Rubanenko complaint asserted similar allegations. Complaint ¶¶ 6-10, Rubanenko v. Matrix Biokinetics, Inc., No BC-196145 (Ca. Super. 1998) Both complaints named Irwin (formerly known as Affiliated Capital Corporation) as a defendant.[9] Considering that these complaints and Paranich's action set out the same allegations against a common defendant, we believe there is enough similarity to

---

[9] The Heifets complaint was amended to add Irwin as a defendant.

19

conclude that Paranich's action was "substantially similar" to the Heifets and Rubanenko complaints and, therefore, that the action was "based upon" them.

We conclude, therefore, that at least with respect to the complaints, all of the elements of the FCA's jurisdictional bar provision are present. Thus, the District Court was without subject matter jurisdiction to hear the merits of Paranich's action unless he qualifies as an original source under Section 3730(e)(4)(B).

## E.  Original Source

Under Section 3730(e)(4)(B), for Paranich to be an original source he must have had (1) direct and (2) independent knowledge of the information on which the allegations are based and (3) have voluntarily information to the Government before filing the action. Because we ultimately find that Paranich fails on the "voluntary" requirement, we do not need to discuss the "direct" and "independent" requirements to resolve this matter. We will, however, comment on these requirements because we believe the District Court erred in focusing on Paranich's limited involvement in his attorney's investigation and its finding that Paranich's knowledge was categorically not direct and independent.

### 1.  Direct

The first requirement for Paranich to qualify as an original source is that his knowledge of the fraudulent conduct must have been "direct." We have interpreted direct to mean

20

"'marked by absence of an intervening agency, instrumentality, or influence: immediate.'" <u>Stinson</u>, 944 F.2d at 1160 (quoting Webster's Third New International Dictionary 640 (1976)). Other courts have interpreted direct to mean "first-hand," <u>Findley</u>, 105 F.3d at 690, "seen with the relator's own eyes," <u>Wang ex rel. United States v. FMC Corp.</u>, 975 F.2d 1412, 1417 (9th Cir. 1992), "unmediated by anything but [the relator's] own labor," <u>id.</u>; <u>see also</u> <u>Fine</u>, 99 F.3d at 1547; <u>United States ex rel. Devlin v. California</u>, 84 F.3d 358, 360-61 (9th Cir. 1996), and "[b]y the relator's own efforts, and not by the labors of others, and . . . not derivative of the information of others," <u>United States ex rel. Hafter v. Spectrum Emergency Care, Inc.</u>, 190 F.3d 1156, 1162 (10th Cir. 1999).

The District Court concluded that Paranich did not qualify as an original source because his knowledge, derived from an investigation conducted by his attorney, was not his own and, therefore, not direct. The Court reasoned further that, because Haber's information came after learning about the <u>Heifets</u> and <u>Rubanenko</u> suits and Transamerica's investigation, Paranich's knowledge was clearly derivative of these prior public disclosures and not direct and independent.[10]

We disagree with the District Court's application of the "direct" knowledge requirement because it failed to consider one very important fact: Paranich did have direct knowledge of

---

[10]    Although the District Court discussed the direct and independent elements together, we will treat them as two separate inquiries.

21

the billing scheme because he was <u>involved</u> in it. The first real question, therefore, is did Haber's investigation, which uncovered most of the fraudulent aspects of the scheme, detract from the "directness" of Paranich's own information? See generally Wang, 975 F.2d at 1417-18; Hafter, 190 F.3d at 1162; Devlin, 84 F.3d at 360-61. Keep in mind that Haber was presumably acting as Paranich's agent, but he was not an <u>intervening</u> agent, as such. Compounding the inquiry further is the fact that the only remaining defendant in the action is Irwin Leasing. Admittedly, Paranich did not have "direct" knowledge of whatever role Irwin may have played in the scheme. But is that necessary in order for the relator who has direct knowledge of the overall scheme to state a claim against one who, as part of the scheme, may have played a role in defrauding the government? We choose not to answer these questions as the latter was not alluded to in the District Court, and, as to the former, the record fails to develop the nature of the agency relationship or the level of Paranich's actual involvement or control over Haber's investigation.[11] While we do not accept the

---

[11] We note that the cases the District Court relied on, and our precedent in this area, are distinguishable in that here Paranich did have some firsthand experience with the billing scheme in that he actually billed Medicare for treatments involving the machine and his attorney conducted the investigation on his behalf, whereas in <u>Mistick</u>, the relator had only strictly secondhand information of a fraud it did not directly observe, and in <u>Stinson</u>, the attorneys were not directly involved in the fraudulent activity and, rather, sought to be relators in their own right based on information gained in the representation of a

22

District Court's terse consideration of the thought that Paranich had "direct" knowledge based solely on Haber's having conducted the investigation, we are not prepared to expand the contours of this requirement in a vacuum.

## 2. Independent

The second requirement for Paranich to qualify as an original source is that his knowledge of the fraudulent conduct must have been "independent." We have interpreted this requirement to mean that knowledge of the fraud cannot be merely dependent on a public disclosure. See Hafter, 190 F.3d at 1160 ("[A] relator who would not have learned of the information absent public disclosure d[oes] not have 'independent' information within the statutory definition of 'original source.'"); accord Findley, 105 F.3d at 683 ("Independent knowledge is 'knowledge that is not itself dependent on public disclosure.'") (quoting Quinn, 14 F.3d at 656); Devlin, 84 F.3d at 361 ("The fact that the relators had evidence of the fraud prior to the public disclosure of the allegations establishes that their knowledge was 'independent.'"). Furthermore, although a relator does not have to be aware of a disclosure in order for it to be a public disclosure, logically, the relator would have to know of a disclosure in order for his information to be deemed dependent

client who was directly involved in the fraud.

on it.[12]

Unlike the District Court, we do not find Paranich's knowledge to have been derived exclusively from the public disclosures. Instead, as we have pointed out above, his initial knowledge was, from his own experience, independent of such disclosures. And Haber's efforts were similarly independent of the public disclosures. As early as April 1998, subsequent to the October 22, 1997 serving of the subpoena but prior to the filing of the California lawsuits, the issue of the Transamerica hearing report, and Paranich and Haber's awareness of the March 1998 Medicare bulletin, Haber wrote letters to the FBI and the U.S. Attorneys' offices outlining the alleged fraud perpetrated by Matrix and affiliated companies. The letters are proof that Paranich and Haber's knowledge of the alleged fraud was independent of the California lawsuits for the simple fact that these letters predated the filing of those suits. Their knowledge similarly predated and was therefore independent of the FOIA report; Haber did not even request the FOIA report until October

---

[12] Bear in mind that our interpretation of "independent" in the original source exception is consistent with its common denotation–"not dependent" or "not requiring or relying on something else : not contingent." Merriam Webster On-Line Dictionary, at http://www.merriamwebster.com. Our interpretation of this word is not affected by the type of statutory construction we have applied to our interpretation of "based upon." See supra Part IV.D (interpreting "based upon" to mean "supported by" or "substantially similar to," not "actually derived from").

24

7, 1998, six months after he wrote the letters. Finally, the letters seem to have predated Paranich and Haber's awareness of the March 1998 Medicare bulletin; the record suggests that Paranich and Haber were not aware of this bulletin until in or around October 1998.[13]   Even had Haber known of the

---

[13] We must point out that the record is not entirely precise on dating Haber's awareness of the March 1998 Medicare bulletin. The District Court's fact finding regarding the bulletin and the Transamerica hearings is imprecise. As discussed at supra note 3, the District Court incorrectly dated the bulletin as being published in October 1997. See Paranich, 286 F. Supp. 2d at 449. Also, the Court states that "[w]hen attorney Haber learned of the hearings in October 1998, he filed a request with the government for the hearing report under the [FOIA]." Id. (emphasis added). Importantly, there was no finding regarding when Haber learned about the bulletin. In Irwin's statement of facts, the facts upon which the District Court primarily relied, see supra note 5, Irwin states: "By October 1998, Atty. Haber knew that Transamerica had published a bulletin in March 1998 that was sent to its members advising them not to bill Matrix services under the CPT codes for nerve blocks." (Def. Irwin Leasing Corp.'s Statement of Facts in Supp. of Mot. for Summ. J. ¶ 35, at 6)  To support this statement, Irwin cites Haber's deposition (January 10, 2003, p. 106, ln. 11 to p. 107, ln. 18) and Exhibit 17 (a fax of the bulletin from Mary C. Suffoletta, an attorney at Haber's firm, to Paranich, dated October 23, 1998), the relevant portions of which are both included in the record before us. This statement itself suggests that Haber learned of the bulletin in October 1998, but actually reads that he learned

bulletin prior to writing the letters, the bulletin did not contain any allegations that Matrix and other parties engaged in deliberate misrepresentations; the bulletin merely explained that the use of the Matrix should not be billed as nerve block injections. Accordingly, we conclude that Paranich's knowledge of the fraudulent conduct was independent of the public disclosures.

### 3. Voluntary

The last requirement for Paranich to qualify as an original

---

of it <u>by</u> then. In the deposition, Haber never clearly indicated when he learned about the bulletin. Furthermore, the fax itself is from Suffoletta to Paranich; it indicates only that Paranich was made aware of the bulletin on October 23, 1998 (and that Suffoletta was aware of the bulletin at least by this date), but does not date Haber's awareness. Informed as we are by the record, we can guess that Haber was most likely not aware of the bulletin when he wrote the April letter, which was at most a month after the bulletin was published; it would not make much sense for him to have been aware of it and not cite it in the letter or, at the very least, for him to hold on to that information for six months before having a colleague fax it to his client. Although this reasoning appears sensible, it is, fundamentally, supposition, which is not an appropriate basis for our analysis. However, while this detail is material to a determination of whether Haber's knowledge of the alleged fraud was independent of the bulletin, fortunately, this determination is not critical to resolution of this issue.

source is that he must have "voluntarily" provided information to the government before filing the action. Although our courts have previously commented on the temporal requirement of providing information to the government before the qui tam action is filed, see, e.g., Stinson, 944 F.2d at 1168 (Scirica, J., dissenting); cf. United States ex rel. Merena v. SmithKline Beecham Lab., Inc., 114 F. Supp. 2d 352, 358-62 (E.D. Pa. 2000), heretofore we have not engaged in an extended analysis of what "voluntarily" means. Here, Paranich supplied information after certain records had been subpoenaed by the government. Accordingly, we must explore whether Paranich provided materials voluntarily to the extent that, in addition to the materials subpoenaed, Paranich's attorney conducted an investigation and provided additional information to the government. While if only the subpoenaed information were supplied there would be no question that the information was not provided voluntarily, the question here is whether provision of other material, without specific compunction, renders the giving of information to have been "voluntary" for the purposes of the FCA. Because some of our sister courts have had an opportunity to explain what it means to provide information "voluntarily," we turn to the fruits of their labors for guidance.

In United States ex rel. Fine v. Chevron USA Inc., 72 F.3d 740 (9th Cir. 1995) (en banc), the Ninth Circuit was presented with a qui tam action brought by a former employee of the Office of the Inspector General at the U.S. Department of Energy. The relator, an assistant manager of the Western Region Audit Office, had left his job after his supervisors failed to pursue every perceived violation he brought to their attention and subsequently filed several qui tam actions based on audits

27

and investigations he had done during his employment. <u>See Fine</u>, 72 F.3d at 742. Affirming the District Court, the majority held that it was without jurisdiction because the claims were based upon publicly disclosed allegations and the original source exception did not apply because the relator had provided the information to the government not voluntarily, but as part of his job responsibilities as a government employee. <u>See id.</u> at 745.

To reach that conclusion, the majority relied on a dictionary definition of "voluntary" supporting a common-sense reading of the term: "'[a]cting, or done, of one's own free will without valuable consideration; acting or done without any present legal obligation to do the thing done or any such obligation that can accrue from the existing state of affairs.'" <u>Id.</u> at 744 (quoting Webster's Third New International Dictionary 2564 (1981) (definition 1(g))). Under this definition, the majority determined that the relator was not a volunteer because he acted in return for valuable consideration, <u>i.e.</u>, his salary, and under an employment-related obligation to do the very acts he claimed were voluntary. <u>See id.</u> at 743-44 (noting that "[the relator] no more voluntarily provided information to the government than we, as federal judges, voluntarily hear arguments and draft dispositions").

The relator, citing a floor statement by Senator Grassley, the principal sponsor of the 1986 amendments to the FCA, argued that the provision of information to the government should be held to be voluntary unless compelled by a subpoena. <u>See id.</u> The statement by Senator Grassley is provided below:

In the definition of "original source," the

28

requirement that the individual "voluntarily" informed the Government or news media is meant to preclude the ability of an individual to sue under the qui tam section of the False Claims Act when his suit is based solely on public information and the individual was a source of the allegations only because the individual was subpeonaed [sic] to come forward. However, those persons who have been contacted or questioned by the Government or the news media and cooperated by providing information which later led to a public disclosure would be considered to have "voluntarily" informed the Government or media and therefore considered eligible qui tam relators.

132 Cong. Rec. 20,536 (Aug. 11, 1986). The majority rejected the relator's narrow interpretation of this statement, finding that the statement did "not purport to describe the only situation in which the voluntary disclosure requirement would bar a qui tam suit following a public disclosure." Fine, 72 F.3d at 744 (stating further that "a single floor statement could not convince us to adopt so tortured a construction of a commonly understood word") (citing Chrysler Corp. v. Brown, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history.")). Lastly, the relator argued that the majority had to construe his disclosures as voluntary lest it create a rule that barred all federal employees from being original sources in violation of a 1989 Executive Order directing employees to "'disclose waste, fraud, abuse, and corruption to appropriate authorities.'" Id.

29

(quoting Exec. Order No. 12,674, 54 Fed. Reg. 15,159, § 101(k) (Apr. 14, 1989)).  The Court summarily rejected this argument, stating that the fact that the relator was employed specifically to disclose fraud was important to the determination that his disclosures were not voluntary.[14]  See id.

---

[14]  Besides the majority opinion, Fine generated one dissent and three concurrences.  The dissenting opinion argued that there was nothing in the FCA or its legislative history suggesting that a federal employee, or, specifically, an Inspector General, could not bring a qui tam action.  See Fine, 72 F.3d at 749 (Leavy, J., dissenting).  The dissent further argued that the majority's view that the provision of information when one has a legal duty to do so renders the performance of that duty nonvoluntary was contorted because a legal duty does not affect one's choice to perform.  See id. at 750 (Leavy, J., dissenting).  That this interpretation of voluntary relied too much on the actor's state of mind, a highly unusual and objectively unverifiable factor on which to hinge a federal court's subject matter jurisdiction, was pointed out in one of the concurring opinions.  See Fine, 72 F.3d at 746 (Kozinski, J., concurring).  The concurring opinions also referred to the policies underlying the FCA, noting that the Act had been amended to provide incentives for disclosure to those who would otherwise have no reason to speak out, not to force the government to pay for information to which it was already entitled, see id. (Kozinski, J., concurring), and that allowing federal employees to pursue private claims based on their official investigations could result in agents of the United States gaining a personal financial stake in the outcome of their efforts, resulting in persons whose job it

In <u>United States ex rel. Barth v. Ridgedale Electric, Inc.</u>, 44 F.3d 699 (8th Cir. 1995), the Eighth Circuit also interpreted the voluntary provision requirement in light of the policy underlying <u>qui tam</u> actions. In that case, the relators, an electrical worker ("Barth") and an electrical workers' union ("Union"), brought an action against an electrical contractor and its president for submitting false certifications of contract compliance and fraudulent payroll reports to the government for work on a federally funded electrical construction project. <u>Barth</u>, 44 F.3d at 701. Barth's provision of information was actually initiated by an HUD investigator and the provision of information was more than two years after the alleged fraudulent activities. <u>See id.</u> at 704. The District Court had dismissed the action for lack of subject matter jurisdiction because the Union's knowledge of the false claims was not sufficiently "direct" and Barth's provision of information to the government was not sufficiently "voluntary" to qualify as an original source under the FCA. <u>See id.</u> Affirming the decision of the District Court, the Eighth Circuit reasoned that <u>qui tam</u> actions were designed to encourage private individuals cognizant of fraud on the government to bring such information forward at the earliest possible time and that one who was providing information only in response to a government inquiry was not doing so voluntarily within the meaning of the Act. <u>See id.</u> In other words, rewarding an individual for "merely complying with the government's investigation [wa]s outside the intent of the Act."

---

is to discover and report fraud benefitting from down playing the importance of their discoveries, <u>see id.</u> (Hawkins, J., concurring).

31

Id.

Lastly, in United States ex rel. Stone v. AmWest Savings Association, 999 F. Supp. 852, 857 (N.D. Tex. 1997), the District Court for the Northern District of Texas, citing both Fine and Barth, interpreted voluntary to mean "uncompensated" or "unsolicited," not "uncompelled." The Court concluded that the relator in that case did not voluntarily provide information to the government because he did so (1) seven months after leaving employment with the defendant as its president and CEO and (2) only after securing criminal immunity for providing statements about the defendant's questionable business dealings in the course of a government fraud investigation of the defendant. See Stone, 999 F. Supp. at 858.

After reviewing the cases discussed above, we conclude that a putative relator does not, consistent with the policy underlying qui tam actions, "voluntarily" provide information to the government where the government has identified the putative relator as being involved in the fraudulent activity and has initiated contact with a subpoena demanding information fundamental to the putative relator's action. In such a case, as with cases involving federal employees charged with investigating fraud, and with cases involving complacent, reluctant, or delinquent informants, the incentive of a qui tam action as an anti-fraud device is lost and the putative relator's further participation in the government's investigation is necessarily fueled by other forms of self-interest. Information not specifically compelled but nonetheless brought forward as a result of the government's pointed contact should not be deemed "voluntarily" provided. Indeed, as Senator Grassley

32

noted in the Congressional hearings cited by the Court in <u>Fine</u>, the case in which a putative relator's provision of information is specifically not voluntary would be where it is compelled by a subpoena. <u>See</u> 132 Cong. Rec. 20,536 (Aug. 11, 1986) (statement of Sen. Grassley) (excluding from class of potential <u>qui tam</u> relators individuals whose suits are based solely on public information and were sources of allegations only because they were subpoenaed to come forward); <u>see also, e.g.</u>, <u>Stinson</u>, 944 F.2d at 1168 n.1 (Scirica, J., dissenting) (noting that those who provide information pursuant to a subpoena do not do so voluntarily) (citing statement by Senator Grassley); <u>United States ex rel. Ackley v. IBM</u>, 76 F. Supp. 2d 654, 666 (D. Md. 1999) ("'Voluntarily' means not in response to a subpoena.") (citing statement by Senator Grassley). It seems to undermine the voluntary provision requirement to allow a relator to extract the benefit of a <u>qui tam</u> action where his participation in the investigation was precipitated by a subpoena and sustained by self-interest, with all indications suggesting that the relator would not have come forward otherwise.

As applied to the instant case, once Paranich was served with a subpoena, his cooperation with the government and further investigation of any fraudulent conduct on the part of Irwin was simply not voluntary. Although Paranich was not compelled by the subpoena to outline or research Matrix's fraud, his investigation was initiated by the subpoena and motivated by a desire to shift the focus of the fraud investigation from himself to another party (<u>i.e.</u>, Irwin). (<u>See</u> Haber Dep. 220:10-20) Indeed, to this end, Paranich has at several points during this litigation highlighted the fact that in response to the government's "vague and non-targeted" subpoena he produced

33

"seventy (70) boxes of billing records." Paranich no doubt stresses this point in these terms both to display his enthusiastic cooperation with the government's investigation and to prove that his discovery of the fraud was all his own, unassisted by the subpoena. While this shading of the facts is well suited to steer us away from the conclusion that the subpoena was a public disclosure or that Paranich's action was based upon the information contained therein, it also serves to steer us toward our conclusion that Paranich was not a voluntary originator of this investigation. This conclusion is solidified by counsel's admission at oral argument that each of the seventy boxes was submitted in response to the subpoena and none was voluntarily provided to the government based on Paranich's own further investigation. Paranich simply cannot acknowledge that everything he turned over to the government was pursuant to the subpoena and then, in the same breath, persuasively argue that his provision of information to the government was voluntary.

The materials produced by Haber's further investigation and supplied in Haber's two letters to the government stand on no better footing. While the letters were clearly not in response to the subpoena, as such, they were produced as a result of the government's focus on Paranich and in an attempt to obtain a favorable outcome, as Haber himself specifically stated in his deposition.[15] In short, while it may be an appropriate legal

_____

[15] Haber stated the following in his January 10, 2003 deposition:

> Q [Mr. Kaus]: This is a letter dated January 30, 2001 from Mr. Haber to Mr. Latona and Mr.

34

strategy for the subject of a subpoena in a fraud investigation to cooperate with the government and provide additional information in an attempt to shift attention to a properly implicated third party, it is contrary to the policies underlying qui tam actions to allow that individual, already conscripted into aiding the government, to be with clothed with the imprimatur of being an "original source," with a potential of pecuniary gain, as against the third party.

## V. Conclusion

In sum, we conclude that the jurisdictional bar of the FCA applies in this case because Paranich does not qualify as

---

Keller; correct?
A [Mr. Haber]: That's correct.
Q: And it says in paragraph two, ["]Stephen also probably did not explain that developing this case on his behalf was part of our strategy to avoid his prosecution by the government[.] In doing so[,] we made him more valuable to the government as a relator than as a defendant[."] First of all you said that; right?
A: That's correct.
Q: Second of all, you meant it; right?
A: Yes, I did.
(Haber Dep. 220:10-20)

35

an original source because his provision of information to the government was not voluntary within the meaning of Section 3730(e)(4)(B). Consequently, the District Court was without subject matter jurisdiction to hear Paranich's action.

For the reasons set forth above, we will AFFIRM the order of the District Court dismissing Paranich's action as jurisdictionally barred.